## Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        WESTERN DISTRICT OF WASHINGTON
 3                 AT SEATTLE
 4   _____
 5   Kristin Bain,
 6              Plaintiff,
 7        vs.          Case No. 09-CV-00149-JCC
 8   Metropolitan Mortgage Group,
 9   Inc.; IndyMac Bank, FSB; Mortgage
10   Electronic Registration Systems;
11   Regional Trustee Service;
12   Lenders Processing Service, Inc.,
13   inclusive,
14              Defendants.
15   _____
16
17        DEPOSITION OF BETHANY A. HOOD
18          Taken January 13, 2010
19
20
21
22
23        CINDY L. SCHULTZ, RMR, CRR, CLR
24     PARADIGM REPORTING & CAPTIONING INC.
25   612.339.0545 * 1.800.545.9668 * Fax 612.337.5575
```

## Page 2

```
 1        The deposition of BETHANY A. HOOD, taken on
 2   January 13, 2010, commencing at 4:07 p.m., taken at
 3   1400 Rand Tower, 527 Marquette Avenue, South,
 4   Minneapolis, Minnesota, before Cindy L. Schultz,
 5   Registered Merit Reporter, Certified Realtime Reporter,
 6   Certified LiveNote Reporter, and Notary Public of and
 7   for the State of Minnesota.
 8           A P P E A R A N C E S
 9   ON BEHALF OF PLAINTIFF KRISTIN BAIN:
10     Melissa A. Huelsman, Esq.
11     LAW OFFICES OF MELISSA A. HUELSMAN, P.S.
12     Suite 1050
13     705 Second Avenue
14     Seattle, Washington 98104
15     206.447.0103
16   TELEPHONICALLY ON BEHALF OF DEUTSCHE BANK NATIONAL
17   TRUST COMPANY AND JPMORGAN CHASE BANK (Wood v.
18   Deutsche Bank National Trust Company, et al.):
19     Josh Rataezky, Esq.
20     DAVIS WRIGHT TREMAINE LLP
21     Suite 2200
22     1201 Third Avenue
23     Seattle, Washington 98101
24     206.622.3150
25     joshrataezyk@dwt.com
```

## Page 3

```
 1   APPEARANCES (Continued):
 2
 3   ON BEHALF OF DEFENDANT LENDER PROCESSING SERVICES:
 4     Richard E. Spoonemore, Esq.
 5     SIRIANNI YOUTZ MEIER & SPOONEMORE
 6     1100 Millennium Tower
 7     719 Second Avenue
 8     Seattle, Washington 98104
 9     206.223.0303
10     rspoonemore@sylaw.com
11            and
12     Ross Gloudeman, Esq.
13     LENDER PROCESSING SERVICES
14     Suite 200
15     1270 Northland Drive
16     Mendota Heights, Minnesota 55120
17     651.234.3662
18     ross.gloudeman@lpsdefaultsolutions.com
19
20
21
22
23        NOTE:  The original transcript will be filed
24   with the Law Offices of Melissa Huelsman pursuant to
25   the applicable Rules of Civil Procedure.
```

## Page 4

```
 1            I N D E X
 2   WITNESS:  BETHANY A. HOOD
 3   EXAMINATION BY                    PAGE
 4   Ms. Huelsman. . . . . . . . . . . .5
 5
 6   INSTRUCTIONS NOT TO ANSWER
 7     None
 8
 9   DOCUMENT REQUESTS
10     None
11
12   PLAINTIFF EXHIBITS MARKED/REFERRED TO
13   No. 3:  9/3/08 Assignment of Deed of Trust. . . 82
14        LPS-BAIN 0001 - 0002
15   No. 23:  Default Services Agreement Between
16        IndyMac Bank, FSB and Fidelity National
17        Foreclosure Solutions, Inc. . . . . . . . 16
18        LPS-BELL 0009 - 0012
19   No. 24:  Agreement for Signing Authority. . . . 16
20        LPS-BELL 0005 - 0008
21   No. 25:  First Addendum to Default Services
22        Agreement. . . . . . . . . . . . . .16
23        LPS-BELL 0013 - 0015
24   No. 26:  Appointment of Successor Trustee. . . .17
25        LPS-BELL 0003 - 0004
```



**Page 5**

BETHANY A. HOOD,
being first duly sworn, was examined and testified as
follows:
EXAMINATION
BY MS. HUELSMAN:

Q. Good afternoon, Ms. Hood.

A. Good afternoon.

Q. My name is Melissa Huelsman. I'll be taking your deposition today.

Can you please state your full name and your business address?

A. My name is Bethany Ann Hood. Business address, 1270 Northland Drive, Suite 200, Mendota Heights, Minnesota, 55120.

Q. And have you ever had your deposition taken before?

A. No.

Q. No?

A. No.

Q. Okay. So I'm sure Mr. Spoonemore has gone over the rules with you, but I'm just going to give you a few quick reminders. We need to both be careful not to speak over each other. It's extremely common when people are regularly talking, but we can't do it for purposes of deposition or the court reporter gets

**Page 6**

confused, because she has to taken down every word that we say.

You also need to make sure that you answer a question audibly, and so, in other words, if it's a yes or no, you need to either say yes or no. Don't say mm-hmm or un-unh, because that's very vague and ambiguous on the deposition transcript. Okay?

A. Okay.

Q. All right. And you need to keep your voice up so the court reporter can hear you.

I am here today trying to get your best testimony, and so I don't want you to guess at an answer. Inevitably what happens when people guess is they guess wrong, and then we find out later that they've guessed wrong, and then it doesn't look good on your testimony because you've testified under oath to something which is incorrect. I don't want you to do that unintentionally. However -- or, actually, I don't want you to do it, period, as well. But I can ask for your best estimate. So if you can make a reasonable estimation, then please do so. And that's not a guess.

A. All right.

Q. Okay. If I ask a question that you don't understand or which is unclear, let me know. I'll be happy to rephrase it. I don't want -- My goal here is

**Page 7**

not no mislead you. I want your best testimony, I want it to be accurate, and I want it to be based upon a correct understanding of the questions that I have asked. So just let me know if you need me to rephrase it or you don't understand it.

A. Okay.

Q. Okay. And remember that if you don't know, "I don't know" is a perfectly acceptable answer. All right?

A. All right.

Q. Okay. Can you please tell me your current role or job title at LPS?

A. My current job title at LPS is manager of the customer support department.

Q. And what does the customer support department do?

A. They provide customer support.

Q. What does that mean? Can you explain to me with more specificity?

A. The customer support department at LPS handles communication between our clients and our attorney firms or other vendors to make sure that the flow of communication is correct and accurate.

Q. Okay. Is that it?

A. Basically, yes.

**Page 8**

Q. Why don't you give me your education background, starting after high school.

A. I completed two semesters at the University of Minnesota.

Q. And that's all?

A. Yes.

Q. I don't mean -- I don't mean that negatively, I just mean that this is --

A. That is all.

Q. All right.

And can you give me your job history, then, after high school?

A. I -- Directly after high school I worked for Arby's Restaurant in West St. Paul, Minnesota. After that I worked for Bruegger's Bagels, and then I became an employee of Fidelity, now known as LPS.

Q. And when did you become an employee of Fidelity?

A. March of 2006.

Q. And what was your role when you were hired by Fidelity?

A. My role was supervisor in the customer support department.

Q. Is that the same role you hold now -- or the job title you hold now?

Page 9

1  **A.  No, it is not.**
2  Q.  Okay.  So you were a supervisor, now you're a
3  manager?
4  **A.  Correct.**
5  Q.  Have there been any job titles in between?
6  **A.  No.**
7  Q.  Okay.  And what was your job when you were a
8  supervisor?
9  **A.  When I was a supervisor, I held basically the**
10 **same role as I do now, the flow of communication**
11 **between clients and attorneys.  Not a whole lot**
12 **different, actually, than what I do now.**
13 Q.  Okay.  So based upon my understanding of
14 taking testimony all day here today, what that means is
15 you help banks, lenders, and servicers communicate with
16 the attorneys that are in the attorney network in order
17 to facilitate either foreclosures or Motions for Relief
18 From Stay or bankruptcy-related issues; is that
19 correct?
20 **A.  Yes, that's correct.**
21 Q.  Okay.  And so your department deals with
22 foreclosures and bankruptcies?
23 **A.  Yes.  Mainly foreclosure, but some**
24 **bankruptcy.**
25 Q.  Okay.  And do you have particular lenders and

Page 10

1  servicers or attorney firms that you're assigned to
2  work with?
3  **A.  No.**
4  Q.  So it's just kind of a mixed bag of -- you
5  could be working with anybody?
6  **A.  Correct.**
7  Q.  Okay.  All right.
8     And are you also required to sign documents,
9  Assignments of Deeds of Trust, Appointment of Successor
10 Trustee documents?
11 **A.  Yes, that is one of my roles.**
12 Q.  And how often do you do that, signing
13 documents?
14 **A.  Daily.**
15 Q.  Okay.  Do you know how many times a day you
16 do that?
17 **A.  I can estimate.**
18 Q.  That's what I want, your best estimate.
19 **A.  Anywhere between 25 to 75 per day.**
20 Q.  Okay.  And can you describe that process to
21 me, how you get the documents?
22 **A.  The documents are brought over by a member of**
23 **the document execution department and delivered to me**
24 **for review and signature.**
25 Q.  Okay.  And do you review them before you sign

Page 11

1  them?
2  **A.  I do a cursory review of the documents to**
3  **ensure that, you know, it's something that I have**
4  **proper signing authority for, and I check the -- the**
5  **loan itself to make sure that it's -- the document is**
6  **for the loan of record in our system prior to signing.**
7  Q.  So you're making sure that the -- the
8  numbers -- the identifying numbers match up so you're
9  executing the right document for the right loan?
10 **A.  Correct.**
11 Q.  Okay.  Is that the extent of your review?
12 **A.  Yes.**
13 Q.  Okay.  Do you also make certain that -- So
14 you did say you also make certain that you have the
15 authority to sign on behalf of whatever entity you're
16 being asked to sign on behalf of?
17 **A.  Correct.**
18 Q.  Okay.  I want to -- In that stack I want to
19 turn your attention to pull out Exhibits 1, 3 and 17.
20 You're going to need 18 in a minute, so set it aside.
21 **A.  I apologize, these do not appear to be in**
22 **order.**
23 Q.  No.  We jumbled them up.  We like to keep on
24 our toes.  I'll tell you what, can you find 23, 24 and
25 25?

Page 12

1  **A.  Yes.**
2  Q.  Okay.  So put this aside.  Okay.  You can put
3  some -- this one aside, because it's duplicated in
4  that.  Okay, so we're looking at Exhibits 23, 24 and
5  25, right?
6  **A.  Yes.**
7  Q.  Okay.  As well as Exhibit 3.  You also have
8  Exhibit 3 there, right?
9  **A.  Yes.**
10 Q.  Okay.  So turning to Exhibit 3, is that your
11 signature on the first page?
12 **A.  Yes.**
13 Q.  And you signed that document on behalf of
14 Mortgage Electronic Registrations Systems, Inc. as a
15 nominee for its successors and assigns; is that
16 correct?
17 **A.  Yes.**
18 Q.  Do you know who its successors and assigns
19 are for purposes of this document?
20 **A.  I do not.**
21 Q.  Okay.  And when you described the process for
22 me a minute ago about when you sign, you described
23 someone from the document execution team bringing you
24 the documents, correct?
25 **A.  Yes.**

3

Page 13

1    Q.   Okay.  Do you sign the documents in front of
2 that person?
3    A.   Yes, I do.
4    Q.   Is that person the notary -- a notary?
5    A.   I am not aware if that person is a notary or
6 not.
7    Q.   Okay.  And does that person simply watch you
8 sign and then takes the documents back?
9    A.   Correct.
10    Q.   Do you ever sign a notary log in
11 connection with your signing?
12    A.   No.
13    Q.   Do you keep track of the documents that you
14 sign?
15    A.   No.
16    Q.   Okay.  And is Paris Jackson an employee of
17 LPS -- or was an employee of LPS?
18    A.   Yes.
19    Q.   It's a she, I'm assuming?
20    A.   Yes.
21    Q.   Okay.  Did she -- was she one of the people
22 who would bring you documents for signing?
23    A.   Yes, she was.
24    Q.   Okay.  And -- But you don't know if she was
25 acting as a notary whenever she watched you sign?

Page 14

1    A.   I am aware that Paris Jackson is a notary,
2 and she was the one who delivered the documents to me
3 and watched me sign them.
4    Q.   You remember that about this specific
5 document?
6    A.   It was -- Having documents delivered and
7 having them delivered by a notary is a daily
8 occurrence.
9    Q.   So the people who deliver them are always
10 notaries?
11    A.   Yes.
12    Q.   You know that for a fact?
13    A.   Yes.
14    Q.   Okay.  And how do you know that?
15    A.   Part of the customer support department is
16 the document execution department, and I'm a manager of
17 the customer support department, so I am also over the
18 document execution group.
19    Q.   Okay.  And do you provide any information to
20 the people who bring you this document about in what
21 capacity you're signing the document?
22    A.   Could you rephrase?
23    Q.   Do they -- do you tell the person who's
24 bringing you the document on whose behalf you're
25 signing, or do they just simply ascertain that from the

Page 15

1 document?
2    A.   I do not tell them information about the
3 document.
4    Q.   Okay.  And when you sign documents like
5 Exhibit 3 that we're looking at and when there's
6 information filled in on the notary thing about who
7 signed and when, in this case it doesn't have the
8 company name or anything, do you fill out any of that
9 part of it, the notary block?
10    A.   I do not.
11    Q.   And do you know what happens to the documents
12 after you sign them?
13    A.   After I sign the documents, they are then
14 notarized and a step is entered in our system of record
15 to indicate that it is being returned back to the
16 requester.
17    Q.   And after that, you're aware -- and you only
18 know that because of your role as the manager of the
19 department, correct?
20    A.   That's correct.
21    Q.   Okay.  You're not involved in that process?
22    A.   No, I'm not.
23    Q.   Okay.  And then the documents, do they ever
24 come back to LPS after being recorded?
25    A.   No.

Page 16

1    Q.   Okay.  And when you -- Do you recall signing
2 Exhibit 3?
3    A.   I do not specifically recall signing
4 Exhibit 3.
5    Q.   Okay.  I want you to turn to Exhibits 23, 24
6 and 25, and I just want to know if you were relying
7 upon these documents to give you authority to sign when
8 you signed Exhibit 3?
9    A.   (Reviewing documents).  When I signed
10 Exhibit 3, I was relying on Exhibits 23 and 24.
11    Q.   Right, because 25 had not been signed yet.
12    A.   Exactly, 25 had not been signed yet.
13    Q.   Okay.  I want to point you back at Exhibit 3,
14 though.  Do you see where it says in the second
15 paragraph on the first page that IndyMac Federal Bank
16 is the one doing the appointment?
17    A.   I am looking now at Exhibit 3.
18    Q.   Oh, I'm sorry.  Oh, here I go.  Sorry.  Wrong
19 document.  Sorry.
20         The first paragraph, do you see where it says
21 the loan is -- the Deed of Trust is being assigned to
22 IndyMac Federal Bank, FSB?
23    A.   I see that.
24    Q.   Okay.
25         Do you -- Only if you know, do you know of

4

**Page 17**

1 any documents -- do you know what the policy -- what
2 LPS's policy was as regards IndyMac Bank and then it
3 being converted over to IndyMac Federal Bank for
4 purposes of the authority of LPS?
5    A. I do know a little. I'm not a member of the
6 legal department --
7    Q. I understand.
8    A. -- but I do understand that the -- the -- the
9 contracts that LPS had in effect with IndyMac Bank were
10 not repudiated by the FDIC. And we were informed by
11 OneWest that the contracts and the signing authority
12 were, in fact, still valid.
13    Q. Okay. Okay. All right. I want to turn your
14 attention -- Go ahead and put those away so you don't
15 get them confused. We're going to look at Exhibits 16,
16 18 and 26.
17    A. Okay. 16?
18    Q. 16, 18 and 26. Got them?
19    A. Yes.
20    Q. Okay. So we're going to look at Exhibit 26,
21 which is the Appointment of Successor Trustee document.
22 Is that your signature on the second page?
23    A. Yes, it is.
24    Q. Now, excuse me, is that your handwriting to
25 the left of your signature where it has the date and it

**Page 18**

1 has "08/22/08"?
2    A. No, that is not my handwriting.
3    Q. Okay. And is it your handwriting below that
4 where it has an asterisk and it says "Effective
5 8/29/08"?
6    A. No, that is not my handwriting.
7    Q. Do you know if that handwriting was on the
8 document when you signed it?
9    A. I do not recall.
10    Q. Do you have any specific recollection of
11 signing this document?
12    A. I do not have any specific recollection of
13 signing this document.
14    Q. Okay. And is it normal, I guess, for there
15 to be any writing similar to this before you sign on
16 these Appointment of Successor Trustee documents, you
17 know, this "Effective" as of a certain date?
18    A. I have seen similar language "Effective" and
19 then a date.
20    Q. Before you signed?
21    A. Yes.
22    Q. All right. But you don't know when this
23 information got filled in on this document?
24    A. I am not aware of when this information was
25 filled in.

**Page 19**

1    Q. Okay. And do you date your signature
2 normally when there's a blank for it?
3    A. If there were to be a blank there, I would
4 certainly date it with the date that I'm executing the
5 document.
6    Q. Okay. All right.
7       And do you know Matthew ban-a-zou-ski?
8    A. Banaszewsi.
9    Q. Banaszewsi, okay.
10    A. Yes, I do know him.
11    Q. And he's an employee of LPS?
12    A. That is correct.
13    Q. Okay. And is he participant of the document
14 execution team?
15    A. He was at this time, yes.
16    Q. Okay. In August of '08?
17    A. Correct.
18    Q. Okay. And did he -- Was he one of the people
19 who would regularly bring you documents to be signed?
20    A. Yes, he was.
21    Q. And -- I'm sorry I had it screwed up. The --
22 this -- we don't need 16 and 18. Sorry.
23       So when you signed this document, this was
24 also an IndyMac document. And so we looked just a few
25 minutes ago at the corporate resolutions. Would you

**Page 20**

1 have relied upon those same documents to let you know
2 that you had authority to sign this document as well?
3    A. Yes. I don't believe we specifically looked
4 at the corporate resolution from IndyMac Bank, but that
5 is what I would have relied on.
6    Q. Okay. So you just have a list at your desk
7 that shows everybody that you're authorized to sign on
8 behalf of, and you aren't necessarily looking each time
9 at each resolution; is that correct?
10    A. Yeah. It's a little bit unique because I am
11 over that department, and so all of the signers do have
12 books on their desks, and I also have one containing
13 all of the signing authority pertinent. And I actually
14 prepared those books, so I also have the knowledge
15 memorized.
16    Q. Okay. Well, that's good. And I'm sorry if
17 I'm repeating myself. Did I ask you how many people --
18 how many entities you have authority to sign on behalf
19 of?
20    A. You did not ask that.
21    Q. Okay. Then I'm not repeating myself, so go
22 ahead and answer that question, please.
23    A. I can estimate I believe I have authority to
24 execute documents for perhaps 15 entities.
25    Q. Okay. And did you ever have authority to

5

Page 21

1   sign on behalf of Arjent or AmeriQuest?
2       **A.  No.**
3       Q.  No, okay.  What happens, as just regular
4   policy and procedure, at LPS when an entity, upon whose
5   behalf you have signing authority, ceases to exist?
6       **A.  There is specific language within the signing**
7   **authorities themselves indicating that should the**
8   **entity cease to exist, then the signing authority will**
9   **be null.**
10      Q.  It's terminated?
11      **A.  It's terminated, in which case we would**
12  **discontinue executing documents on behalf of that**
13  **entity.**
14      Q.  And how do you get informed about a company
15  ceasing to exist?
16      **A.  I do not personally get informed, but our --**
17  **I'm sure our legal team -- legal department would**
18  **receive that information.  I'm not privy to it --**
19      Q.  Sure.
20      **A.  -- at the front.**
21      Q.  Do they disseminate it to you, though?
22      **A.  Yes.**
23      Q.  Because if you're preparing the books that
24  you just told me about, you need to take out the
25  signing authority from the books for an entity that

Page 22

1   ceases to exist; is that correct?
2       **A.  Correct.**
3           MS. HUELSMAN:  Okay.  That's it.  You're
4   done.
5           THE WITNESS:  I'm done.
6           MR. SPOONEMORE:  You're done.
7           MS. HUELSMAN:  You're done.
8           MR. SPOONEMORE:  That's it.  We will read
9   and sign.  Thank you.
10
11      (The deposition was terminated at 4:27 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1    STATE OF MINNESOTA   )
                            :            ss CERTIFICATE
 2    COUNTY OF HENNEPIN   )

 3
      I, Cindy L. Schultz, RMR, CRR, CLR, a notary public in
 4    and for the County of Hennepin, certify that I reported
      the deposition of BETHANY A. HOOD, who was first duly
 5    sworn by me, having been taken on January 13, 2010, at
      1400 Rand Tower, 527 Marquette Avenue, South,
 6    Minneapolis, Minnesota;

 7    I further certify that I am not a relative or employee
      or attorney or counsel of any of the parties or a
 8    relative or employee of such attorney or counsel;

 9    That I am not financially interested in the action and
      have no contract with the parties, attorneys, or
10    persons with an interest in the action that affects or
      has a substantial tendency to affect my impartiality;
11    that all parties who ordered copies have been charged
      at the same rate for such copies;
12
      That the right to read and sign the deposition by the
13    Witness was not waived.

14    IN WITNESS WHEREOF, I have hereunto set my hand and
      affixed my seal of office at Minneapolis, Minnesota,
15    this 18th day of January 2010.

16

17                        _____
                            Cindy L. Schultz, RMR, CRR, CLR
18                          My commission expires 1/31/2010

19

20

21

22

23

24

25
```

7

ùÛÉ× ÙÆéò øÍÙǰ ×ÎÈò̇øøi ÛÖ× ÍÖ

DEFAULT SERVICES AGREEMENT

BETWEEN

INDYMAC BANK, F.S.B.

AND

FIDELITY NATIONAL FORECLOSURE SOLUTIONS, INC.

DATED AS OF JULY 31, 2007

sf-2355293

Plaintiff

EXHIBIT NO. 23

CLS 1/13/10

LPS-BELL 0009

DECLARATION OF GREG ALLEN IN SUPPORT OF LPS'S
MOTION FOR SUMMARY JUDGMENT – 17
[Case No. CV-09-0C150-RSL]

8



Exhibit 23

ùÛÉ× ÙÆ&éð øÍ ÙÇï ×ÍÈ⊕⊕∅ì ÛÖ× ÍÖ

REDACTED

**2.5    Executing Documents as Signing Officers of IndyMac.**  Where appropriate in connection with the provision of the Services, Fidelity shall designate within Attachment 1 to Schedule D, those Fidelity employees to execute certain documents solely related to the Services on IndyMac's behalf in such employees' capacity as authorized signing agents of IndyMac, as described in the IndyMac's Secretary's Certificate attached hereto as *Schedule D.*  Fidelity shall forward to IndyMac or IndyMac's designee all such documents that cannot be so executed.



LPS-BELL 0010

9

ùÛÉ× ÛÆéõ øíÙĞ ×ÎĒ®Øí ÛÔ× ÎÕ

I, JK Huey, certify that I am Senior Vice President, Home Loan Servicing of IndyMac

Bank, F.S.B. ("Indymac Bank"), a federally chartered savings bank, and further certify that I

have personal knowledge that:

(i) the names set forth on Attachment 1 of Schedule D to the Default Services
Agreement between Fidelity National Foreclosure Solutions, Inc. and IndyMac Bank, F.S.B.
dated July 31, 2007 (the "Agreement") are authorized signing agents of IndyMac Bank in
accordance with and within the limitations set forth in Section 2.5 of the Agreement; and

(ii) that I am authorized to appoint the individuals listed on Attachment 1 of Schedule
D as authorized signing agents of IndyMac Bank and to approve subsequent amendments to
Attachment 1 of Schedule D accordingly.

IN WITNESS WHEREOF, I have hereunto signed my name this ౹6 th day of
August, 2007.

JK Huey
Senior Vice President
Home Loan Servicing

ùÛÉ× Ù EEéð øíÙ̈ ×Î È̈̈Øì ÛÒ× Î Ö

## Schedule D: Attachment 1

### List of Fidelity Employees Authorized to Execute Service Documents for IndyMac Bank

Authorized Signatories:



| | |
|---|---|
| | Vice President |
| | Vice President |
| | Vice President |
| | Vice President |
| | Vice President |
| | Vice President |
| | Vice President |
| Scott Walter | Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Vice President |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| Bethany Hood | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |
| | Assistant Secretary |

REDACTED

2

sf-2555293

LPS-BELL 0012

()

ùÛÉ× ÛÈÈéð øíÙÇˇ ×ÎÈ◊ÇØí ÛÖ× ÍÖ

## AGREEMENT FOR SIGNING AUTHORITY

MERSCORP, INC. ("MERS") and its subsidiary, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., INDYMAC BANK ("IndyMac Bank") and FIDELITY NATIONAL FORECLOSURE SOLUTIONS, INC. ("Fidelity") hereby agree as follows:

1. The purpose of this agreement for signing authority (the "Agreement") is to define the rights and obligations of the parties when Fidelity performs certain duties, as described in the attached corporate resolution (the "Resolution"), relating to mortgage loans that are registered on the MERS® System and shown on the MERS® System to be serviced by IndyMac Bank.

2. IndyMac Bank is a member of MERS, and has signed an agreement of membership that is incorporated herein by reference. IndyMac Bank has entered into a separate contract with Fidelity to perform certain services for IndyMac Bank. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust, respectively, and any other form of security instrument under applicable state law.

3. The parties acknowledge that Mortgage Electronic Registration Systems, Inc. may be the mortgagee of record on IndyMac Bank mortgages. Therefore, in order for Fidelity to perform its contractual duties to IndyMac Bank, MERS by corporate resolution will grant employees of Fidelity, the limited authority to act on behalf of MERS to perform certain duties. Such authority is set forth in the Resolution, which is made a part of this Agreement.

4. The parties agree that IndyMac Bank will provide all necessary information and instructions to Fidelity to perform certain duties where Mortgage Electronic Registration Systems, Inc. acts as the mortgagee of record. All parties agree that MERS and Mortgage Electronic Registration Systems, Inc. are not responsible for the accuracy of any information provided by IndyMac Bank to Fidelity, or any information entered into the MERS® System by or on behalf of IndyMac Bank. Any problems regarding the information or instructions between IndyMac Bank and Fidelity must be resolved between those two parties.

5. IndyMac Bank and Fidelity agree to indemnify and hold harmless MERS, Mortgage Electronic Registration Systems, Inc. and any employee, director, officer, agent or affiliate of MERS or Mortgage Electronic Registration Systems, Inc. ("MERS Party") from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses that result from the negligence, errors and omissions, breach of confidentiality or willful misconduct of Fidelity, in performing certain duties where Mortgage Electronic Registration Systems, Inc. is the mortgagee of record.

6. Fidelity shall maintain appropriate insurance coverage that shall include coverage for any negligence, errors and omissions or willful misconduct of all employees authorized to sign as officers of Mortgage Electronic Registration Systems, Inc.

LPS-BELL 0005

Plantiff

EXHIBIT NO. 24
CLS 1/13/10

Exhibit 24

ù ÛÉ× Ù珢é ð ø í Ù¨ï ×Î Ë¢Ø ï ÛÓ× í Ö

7. Upon termination of the contract between IndyMac Bank and Fidelity, this agreement shall concurrently terminate and the corporate resolution shall be revoked at such time.

8. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

The parties have executed this Agreement intending to be bound as of the dates indicated below.

MERSCORP, INC.

By: _____

Title: Vice President

Dated: 8-15-07

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.

By: _____

Title: Secretary/Treasurer

Dated: 8-15-07

INDYMAC BANK FSB

By: _____

Title: Supervisor FEL/BK

Dated: 8/2/07

FIDELITY NATIONAL
FORECLOSURE SOLUTIONS, INC.

By: _____

Title: S.V.P.

Dated: 08/07/07

LPS-BELL 0006

13

ùÛÉ×Ù Ùῼéð øíÙῼ ×ÎÊ©®Øí ÛÖ× ÎÖ

## MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

### CORPORATE RESOLUTION

Be it Resolved that the attached list of candidates are employees of Fidelity National Foreclosure Solutions, Inc., and are hereby appointed as assistant secretaries and vice presidents of Mortgage Electronic Registration Systems, Inc., ("MERS") and, as such, are authorized to:

execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that is shown to be registered to the Member, including but not limited to (a) substitution of trustee on Deeds of Trust, (b) Trustee's Deeds upon sale on behalf of MERS, (c) Affidavits of Non-military Status, (d) Affidavits of Judgment, (e) Affidavits of Debt, (f) quitclaim deeds, (g) Affidavits regarding lost promissory notes, and (h) endorsements of promissory notes to VA or HUD on behalf of MERS as a required part of the claims process;

I, William C. Huttman, being the Corporate Secretary of Mortgage Electronic Registration Systems, Inc., hereby certify that the foregoing is a true copy of a Resolution duly adopted by the Board of Directors of said corporation effective as of the _15_ day of _August_, 2007, which is in full force and effect on this date and does not conflict with the Certificate of Incorporation or By-Laws of said corporation.

_____
Secretary

(Corporate seal)

LPS-BELL 0007

14

ùÛÉ× Ùɜéð øÍÙ̈ ×ÎÈõ⊛Øì ÛÕ× ÍÖ

Fidelity National Foreclosure Solutions, Inc.

## Mortgage Electronic Registration Systems, Inc.
### Certifying Officers
(in alphabetical order by last name)



Bethany Hood



Scott Walter

REDACTED

LPS-BELL 0008

15

ùÛÉ×ÛÆèéõ øíÙǂ ×ÎõøØ1ÛÔ× ÍÔ

### FIRST ADDENDUM TO
### DEFAULT SERVICES AGREEMENT

THIS ADDENDUM #1 ("ADDENDUM") HEREBY SUPPLEMENTS that certain Default Services Agreement ("Agreement") with an Effective Date of July 31, 2007, executed between IndyMac Bank, F.S.B. ("IndyMac I") and Fidelity National Foreclosure Solutions, Inc. n/k/a LPS Default Solutions, Inc. ("LPSDS"), (collectively the "Parties").

The modifications are as follows:

  A.  The Agreement is amended to replace all mentions of "Fidelity National Foreclosure Solutions, Inc." with the name "LPS Foreclosure Solutions, Inc."

  B.  The Agreement is amended to replace all mentions of "Fidelity" or "FNFS" with the name "LPSDS."

  C.  From the period July 11, 2008 through March 19, 2009 the Agreement is amended to replace all mentions of "IndyMac Bank, F.S.B." with the name "IndyMac Federal Bank, F.S.B" solely pursuant to the terms of the Service Transfer Agreement set forth in Attachment 1 to this Addendum incorporated herein by reference. From the period commencing March 19, 2009, the Agreement is amended to replace all mentions of Indymac Federal Bank, FSB with the name OneWest Bank, FSB, ("OneWest") Only new obligations incurred by OneWest commencing March 19, 2009 shall remain the obligations of OneWest.

  D.  The fifth sentence of Section 12.9 of the Agreement is hereby modified to read as follows:
Notwithstanding the foregoing, OneWest may assign its rights and delegate its future obligations hereunder to another Person in connection with a Change of Control of OneWest or any parent company thereof or any successors thereto.

This Addendum to the Agreement is mutually agreed to by the Parties. All other terms and provisions of the Agreement and any previous Addenda shall remain in full force and effect. To the extent that any terms and conditions of this Addendum may conflict with the Agreement, the terms of this Addendum shall control.

Signed this 6th day of 2010.

ONEWEST BANK, FSB                          LPS DEFAULT SOLUTIONS, INC.

By: _Timothy Otto_                          By: _____

Its: _First Vice President_                 Its: _FIRST VICE PRESIDENT_

                                         1

LPS-BELL 0013

DECLARATION OF GREG ALLEN IN SUPPORT OF LPS'S
MOTION FOR SUMMARY JUDGMENT – 27
[Case No. CV-09-00150-RSL]


Plaintiff
EXHIBIT NO. 25
CLS 1/13/10

Exhibit 25

ùÛÉ× ÙÆéõ øíÙÇ̃ ×ÏÕôØ÷ÕÔ× ÍÕ

### Attachment 1 to
### FIRST ADDENDUM TO
### DEFAULT SERVICES AGREEMENT

### SERVICE TRANSFER AGREEMENT

WHEREAS IndyMac Bank, F.S.B., was a customer of Fidelity National Foreclosure Solutions, Inc. n/k/a LPS Default Solutions, Inc. ("LPSDS") under a Default Services Agreement dated July 31, 2007 ("the Agreement") and LPSDS performed its obligations thereunder (the "Identified Service"); and,

WHEREAS, on July 11, 2008, IndyMac Bank, F.S.B. ("IndyMac Bank") was closed by the Office of Thrift Supervision ("OTS") and FDIC was appointed as receiver (the "IndyMac Bank Receiver") for IndyMac Bank; and,

WHEREAS, pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the IndyMac Bank Receiver, by operation of law, succeeded to all of the rights, title, and interests of IndyMac Bank in and to all of the assets, including all contracts, loans and real property, of the IndyMac Bank (the "IndyMac Bank Assets"); and,

WHEREAS, upon the appointment of the IndyMac Bank Receiver, the OTS (i) chartered Indymac Federal Bank, FSB, Pasadena, California ("Indymac Federal"), (ii) placed IndyMac Federal in conservatorship, and (iii) appointed the FDIC as conservator for Indymac Federal whereupon substantially all of the IndyMac Bank Assets, including the contract which is the subject of this Agreement, were transferred to Indymac Federal; and,

WHEREAS, on March 19, 2009, Indymac Federal (was closed by the Office of Thrift Supervision ("OTS") and FDIC was appointed as receiver (the "Indymac Federal Receiver") for Indymac Federal; and,

WHEREAS, pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the Indymac Federal Receiver, by operation of law, succeeded to all of the rights, title, and interests of the Indymac Federal in and to all of the assets, including all contracts, loans and real property, of Indymac Federal (the "Indymac Federal Assets"); and,

WHEREAS, upon the appointment of the Indymac Federal Receiver, the OTS (i) placed Indymac Federal in conservatorship, and (iii) appointed the FDIC as conservator for IndyMac Federal whereupon substantially all of the Indymac Federal Assets, including the contract which is the subject of this Agreement, were transferred to OneWest Bank FSB; and,

Whereas One West Bank FSB has requested a modification to the services performed under the Agreement;

2

ùÛÉ×ÛꜢéõ øíÙϘ ×ÎÉ⬥ØìÛÕ× ÍÖ

01/06/2310  15:18 FAX                    ONEWESTBANK                          ☒003/003

NOW, THEREFORE, the Parties agree as follows:

1.    As of July 11, 2008 (Indymac Federal replaced the IndyMac Bank as LPSDS'
customer of record for the Identified Service (12 U.S.C. § 1821(d)(2)(G).
2.    This Agreement does not relieve or discharge IndyMac Bank from any liabilities
or obligations associated with the Identified Services that were incurred by the Institution
prior to July 11, 2008.
4.    As of March 19, 2009 OneWest Bank, FSB ("OneWest" replaced Indymac
Federal  as LPSDS' customer of record for the Identified Service (12 U.S.C. §
1821(d)(2)(G).
5.    This Agreement does not relieve or discharge Indymac Federal from any
liabilities or obligations associated with the Identified Services that were incurred by
Indymac Federal prior to March 19, 2010.
6.    The Identified Service shall not be interrupted.
7.    This Agreement may be signed in counterparts, which together will constitute the
original Agreement.

ONEWEST BANK, FSB                     LPS DEFAULT SOLUTIONS, INC.

By: _____                 By: _____

Its: _____                Its: _____

3

LPS-BELL 0015

18